Lesley F. Portnoy, Esq. (304851)
**PORTNOY LAW**
1800 Century Park East, Suite 600
Los Angeles, CA 90067
Tel: (310) 692-8883
Email: lesley@portnoylaw.com

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WANGJUN ZHOU, derivatively on behalf of FARADAY FUTURE INTELLIGENT ELECTRIC INC. f/k/a PROPERTY SOLUTIONS ACQUISITION CORP., | Case No.: |
| Plaintiff, | |
| vs. | **DEMAND FOR JURY TRIAL** |
| CARSTEN BREITFELD, ZVI GLASMAN, WALTER J. MCBRIDE, JORDAN VOGEL, AARON FELDMAN, YUETING JIA, EDUARDO ABUSH, DAVID AMSTERDAM, MATTHIAS AYDT, CHAOYING DENG, EDWIN GOH, BRIAN KROLICKI, LEE LIU, AYI SAVAR, SUSAN SWENSON, SCOTT VOGEL, JIAWEI WANG, and QING YE, | |
| Defendants, | |
| and | |
| FARADAY FUTURE INTELLIGENT ELECTRIC INC. f/k/a PROPERTY SOLUTIONS ACQUISITION CORP., | |
| Nominal Defendant. | |

Verified Shareholder Derivative Complaint

1
2

<u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

<u>**INTRODUCTION**</u>

3      Plaintiff Wangjun Zhou ("Plaintiff"), by Plaintiff's undersigned counsel,
4  derivatively and on behalf of Nominal Defendant Faraday Future Intelligent Electric Inc.
5  f/k/a Property Solutions Acquisition Corp. ("Faraday" or the "Company"), files this
6  Verified Shareholder Derivative Complaint against Defendants Eduardo Abush ("Abush"),
7  David Amsterdam ("Amsterdam"), Aaron Feldman ("Feldman"), Ayi Savar ("Savar"), and
8  Jordan Vogel ("J. Vogel") (together, the "PSAC Defendants"), and Carsten Breitfeld
9  ("Breitfeld"), Zvi Glasman ("Glasman"), Walter J. McBride ("McBride"), Matthias Aydt
10  ("Aydt"), Chaoying Deng ("Deng"), Edwin Goh ("Goh"), Yueting Jia ("Jia"), Brian
11  Krolicki ("Krolicki"), Lee Liu ("Liu"), Susan Swenson ("Swenson"), Scott Vogel
12  ("Vogel"), Jiawei Wang ("Wang"), and Qing Ye ("Ye") (collectively with the PSAC
13  Defendants, the "Individual Defendants") for breaches of their fiduciary duties as directors
14  and/or officers of Faraday; against the PSAC Defendants for violations of Section 14(a) of
15  the Securities Exchange Act of 1934 (the "Exchange Act"); against Defendants Breitfeld,
16  Feldman, Glasman, Jia, McBride, and J. Vogel for contribution under Sections 10(b) and
17  21D of the Exchange Act; and against Defendants Aydt, Breitfeld, Deng, Glasman, Jia,
18  Krolicki, Wang, and Ye (collectively, the "Legacy FF Defendants") for aiding and abetting
19  the PSAC Defendants' breaches of fiduciary duty. As for Plaintiff's complaint against the
20  Individual Defendants, Plaintiff alleges the following based upon personal knowledge as
21  to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based
22  upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which
23  included, among other things, a review of the Defendants' public documents, conference
24  calls and announcements made by Defendants, United States Securities and Exchange
25  Commission ("SEC") filings, wire and press releases published by and regarding Faraday,
26  legal filings, news reports, securities analysts' reports and advisories about the Company,
27  and information readily obtainable on the Internet. Plaintiff believes that substantial
28

evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This shareholder derivative action seeks to remedy wrongdoing committed from January 28, 2021 through November 15, 2021, inclusive (the "Relevant Period"), by Faraday's directors and officers and by the directors or officers of FF Intelligent Mobility Global Holdings Ltd. ("Legacy FF").

2.     Legacy FF, based in California, was founded in 2014 for the purpose of designing and engineering electric vehicles.

3.     Founded in February 2020 as a special purpose acquisition company ("SPAC"), or blank check company, Property Solutions Acquisition Corp. ("PSAC") had its initial public offering ("IPO") on July 24, 2020. Through the IPO and a simultaneous private placement, PSAC raised gross proceeds of nearly $230 million.

4.     In late January, 2021, PSAC and Legacy FF issued a press release announcing an agreement to consummate a business combination (the "Merger"). The terms of the agreement provided that a subsidiary of PSAC would merge with Legacy FF, the latter of which would survive the merger as PSAC's wholly-owned subsidiary.

5.     On June 24 2021, PSAC filed a document with the SEC that functioned as a proxy statement, consent solicitation statement, and a prospectus (the "Proxy Statement"). In the Proxy Statement, the Board solicited the approval of PSAC stockholders for the Merger and Legacy FF's board of directors solicited the approval of Legacy FF shareholders for the Merger. The companies' shareholders approved the Merger, which was consummated on July 21, 2021. The resulting entity—i.e., the Company—changed its name to Faraday Future Intelligent Electric Inc.

6.     During the Relevant Period, the Individual Defendants made false and misleading statements concerning the Company's business standing and prospects. Specifically, the Individual Defendants touted or caused the Company or Legacy FF to tout

Verified Shareholder Derivative Complaint

the purported advantages of Legacy FF, the Merger, and Faraday's progress toward commercializing vehicles.

7.     The misrepresentations by the Individual Defendants' had the effect of misleading investors and artificially inflating the price of the Company's stock throughout the Relevant Period.

8.     On October 7, 2021, the truth began to emerge. J Capital Research ("J Capital") issued a report (the "Report") alleging, *inter alia*, that the Company was unlikely to ever sell a car. The Report also alleged that the Company or Legacy FF had "reneged on promises to build factories in five localities in the U.S. and China," was being sued by "dozens of unpaid suppliers," and had failed to disclose that certain assets in China had been "frozen by courts." Furthermore, the Report alleged that the Company had misleadingly claimed it had received 14,000 reservations for vehicles, and stated that 78% of the reservations were made by a single undisclosed entity that may be an affiliate. The Report also alleged that former engineering executives who worked on the vehicles under development, including and especially the flagship FF 91 vehicle, did not believe the vehicles were anywhere close to production, contrary to statements by Operating Faraday.[1]

9.     On this news, the price per share of the Company's common stock fell $0.35 from its closing price on October 6, 2021, or approximately 4.2%, to close at $8.05 per share on October 8, 2021.

10.     The truth fully emerged on November 15, 2021, when the Company announced that it was unable to timely file its quarterly report on Form 10-Q for the fiscal period ended September 30, 2021. The Company also announced that its Board of Directors ("Board") had formed a special committee of independent directors (the "Special Committee") to "review allegations of inaccurate disclosures."

11.     On this news, the price per share of the Company's common stock fell $0.28

---

[1] The term "Operating Faraday" is sometimes used herein to refer collectively to the Company following the Merger and to Legacy FF as it existed prior to the Merger.

Verified Shareholder Derivative Complaint

from its closing price on November 15, 2021, or approximately 3%, to close at $8.83 per share on November 16, 2021.

12.     The Company announced the findings of the Special Committee's investigation on February 1, 2022. In particular, the Special Committee found that: (1) statements describing Defendant Jia's role at the Company that were made in connection with the Merger were "inaccurate"; (2) statements regarding 14,000 reservations for the FF 91 were "potentially misleading" because mere hundreds of the reservations were paid reservations, while other reservations were unpaid indications of interest; (3) the Company's internal controls over financial accounting and reporting needed an upgrade in terms of personnel and systems; and (4) the corporate culture at the Company failed to sufficiently prioritize compliance. Based on these findings, the Special Committee recommended a number of enhancements to the Company's corporate governance and oversight.

13.     The Individual Defendants breached their fiduciary duties during the Relevant Period by making and/or causing the Company to make a series of materially false and misleading statements regarding the Operating Faraday's business, operations, and prospects. Such false and misleading statements were made willfully or recklessly. Specifically, the Individual Defendants made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) Operating Faraday was not as close to vehicle production as claimed; (2) certain of Operating Faraday's assets in China had been frozen by courts; (3) only several hundred of Operating Faraday's 14,000 touted reservations were paid reservations, while others were merely unpaid indications of interest; (4) a material number of Operating Faraday's reservations for future vehicle deliveries were attributable to a single affiliate that was undisclosed; (5) as a result of the foregoing, the Company would be unable to file its quarterly report for the third quarter of 2021; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's and Legacy FF's public statements were materially false and misleading at

all relevant times.

14.    In further breach of their fiduciary duties to the Company, the Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact. As a result, the Individual Defendants are personally liable to the Company for breaching their fiduciary duties.

15.    The PSAC Defendants breached their fiduciary duties by causing the Company to acquire Legacy FF in the Merger, despite that: (1) Legacy FF was not as close to vehicle production as claimed; (2) certain of Legacy Faraday's assets in China had been frozen by courts; (3) only several hundred of Legacy FF's 14,000 touted reservations were paid reservations, while others were merely unpaid indications of interest; and (4) a material number of Legacy FF's reservations for future vehicle deliveries were attributable to an affiliate that was undisclosed. The PSAC Defendants knew or should have known of these issues. Nonetheless, they breached their fiduciary duties by causing PSAC to acquire Legacy FF on terms that, in light of the issues with Legacy FF, were unfavorable to PSAC and PSAC shareholders (the "Overpayment Misconduct").

16.    In breach of their fiduciary duties to the Company, the PSAC Defendants failed to timely file PSAC's quarterly report for the quarter ended March 31, 2021. In addition, Defendant McBride and the current members of the Company's Board breached their fiduciary duties to the Company by failing to timely file the Company's quarterly report for the third quarter of 2021.

17.    In further breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused Faraday to fail to maintain adequate internal controls. Specifically, the Company's Form 10-Q filed on August 13, 2021 states that, "[d]ue solely to the events that led to the Company's restatement of its December 31, 2020 financial statements on May 27, 2021, *management has identified a material weakness in internal controls* related to the accounting for our Private Warrants." (Emphasis added.)

18.    The PSAC Defendants' breaches of fiduciary duty were aided and abetted by

the Legacy FF Defendants.

19.     The Individual Defendants' misconduct has subjected the Company, its Chief Executive Officer ("CEO"), a former Chief Financial Officer ("CFO"), a second former CFO, the founder of Operating Faraday, and the Company's two former Co-CEOs to a securities fraud class action lawsuit pending in the United States District Court for the Central District of California (the "Securities Class Action"). Furthermore, the Individual Defendants' misconduct has subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein. As a result of the foregoing, the Company will have to expend many millions of dollars. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

20.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, half of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of the substantial likelihood of Defendant Breitfeld's and Defendant J. Vogel's liability in the Securities Class Action, of their not being disinterested and/or independent directors, a majority of the Company's Board cannot consider a demand to commence litigation against themselves on behalf of Faraday with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15

U.S.C. § 78u-4(f)).

22.    Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

23.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

24.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

25.    Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District. In addition, Faraday's principal executive offices are in this District.

## PARTIES

26.    Plaintiff is a current shareholder of Faraday. Plaintiff purchased Company stock during the beginning of the Relevant Period.

27.    Faraday is a Delaware corporation with its principal executive offices at 18455 S. Figueroa Street, Gardena, CA 90248. The Company's common stock trades under the ticker symbol "FFIE" on the Nasdaq Global Market ("NASDAQ").

28.    Defendant Breitfeld served as Legacy FF's CEO from September 2019 until the Merger, and continued in that role at the Company after the consummation of the Merger. He reports directly to Defendant Swenson, the Company's Executive Chairperson. In addition, he was a member of Legacy FF's Board of Directors, and he is currently a member of the post-Merger Board. According to the Proxy Statement, Defendant Breitfeld's base salary increased to $2.25 million in connection with the Merger, although he received a salary reduction of 25% in connection with the Special Committee's investigation. He also has received a lump sum bonus equal to the amount by which his base salary was reduced (to $1.8 million) from September 2019 until the Merger. In addition, he receives corporate housing or a monthly housing allowance, an option to

purchase 13 million shares of Company stock, and a signing and retention bonus of $1.2 million, which vested in part in August 2020 and August 2021 and which will fully vest in August 2022. Defendant Breitfeld is a manager of FF Global Partners LLC ("FF Global"), which, as of the date of the Proxy Statement, controlled Pacific Technology Holding LLC ("Pacific") and thereby held 29.1% of Legacy FF's share capital. Pacific indirectly controls FF Top Holding LLC f/k/a FF Top Holding Ltd. ("FF Top"), which held 121,438,964 shares of the Company's common stock as of July 21, 2021, or approximately 37.4%.

29.    Defendant Glasman served as Legacy FF's CFO from December 2020 until the Merger, and he continued serving as CFO at the Company until October 27, 2021. He remained employed as a senior advisor to the Company through December 31, 2021, and agreed to provide consulting services to the Company as an independent contractor until February 15, 2022. According to the Proxy Statement, Defendant Glasman's annual base salary increased from $320,000 to $600,000 effective April 1, 2021, with a $70,000 true-up payment. Furthermore, he received a transaction bonus of $400,000 upon the consummation of the Merger.

30.    Defendant McBride was the Company's CFO on November 1, 2021 through March 1, 2022. According to the Company's Form 8-K filed on November 2, 2021, which announced Defendant McBride's appointment to the position of CFO, Defendant McBride's annual base salary is $330,000, and he is eligible for a discretionary annual performance bonus of up to $170,000. Additionally, Defendant McBride received restricted stock unit awards with an aggregate grant date fair value of $2.5 million, granted in $500,000 annual increments.

31.    Defendant J. Vogel served as PSAC's Chairman and Co-CEO from its inception until the Merger, when he joined the Company's Board. He became the Board's Lead Independent Director following the Special Committee's investigation. He is a member of the Compensation Committee. In addition, he is a managing member of Property Solutions Acquisition Sponsor, LLC ("Sponsor"). According to the Proxy

Verified Shareholder Derivative Complaint

Statement, Defendant J. Vogel receives annual cash retainers of $50,000 for his service as a director, $6,250 for his service on the Compensation Committee, and an annual restricted stock unit award of $150,000. In connection with this appointment to the position of Lead Independent Director, Defendant J. Vogel became entitled to an additional $27,500 annual retainer.

32.     Defendant Feldman served as PSAC's Co-CEO and Treasurer from its inception.  In addition, he is a managing member of Sponsor.

33.     Defendant Jia is Legacy FF's Founder. He served as Legacy FF's Chief Product and User Ecosystem Officer from September 2019 until the Merger and continued in that role at the Company following the Merger. Defendant Jia is the uncle of Defendant Wang. In connection with the Special Committee's investigation and findings, Defendant Jia now reports directly to Defendant Swenson. Defendant Jia is also a manager of FF Global, which, as of the date of the Proxy Statement, controlled Pacific and thereby held 29.1% of Legacy FF's share capital. Pacific indirectly controls FF Top, which held 121,438,964 shares of the Company's common stock as of July 21, 2021, or approximately 37.4%.

34.     Defendant Abush served as a director of PSAC from February 2020 until the Merger. Defendant Abush is a member of Sponsor.

35.     Defendant Amsterdam served as a director of PSAC from February 2020 until the Merger. Defendant Amsterdam is a member of Sponsor.

36.     Defendant Aydt served as Legacy FF's Senior Vice President of Business Development and Product Definition from November 2019 until the Merger and has continued to serve in that role at the Company following the Merger. He served also as a director of Legacy FF prior to the Merger and is currently a member of the Company's Board. According to the Proxy Statement, Defendant Aydt's base salary is $400,000 and he is eligible to receive a discretionary annual performance bonus (with a target amount of $100,000). Defendant Aydt is a manager of FF Global, which, as of the date of the Proxy

Statement, controlled Pacific and thereby held 29.1% of Legacy FF's share capital. Pacific indirectly controls FF Top, which held 121,438,964 shares of the Company's common stock as of July 21, 2021, or approximately 37.4%. As of the date of the Proxy Statement, Defendant Aydt held 7,332,000 membership units in FF Global.

37.     Defendant Deng is currently the Company's Chief of Staff, Vice President of Corporate Operations, Vice President of Government Affairs and Administration. She previously served as Legacy FF's Vice President of Administration from April 2014 until the Merger, and was also a member of Legacy FF's Board of Directors. Defendant Deng is a manager of FF Global, which, as of the date of the Proxy Statement, controlled Pacific and thereby held 29.1% of Legacy FF's share capital. Pacific indirectly controls FF Top, which held 121,438,964 shares of the Company's common stock as of July 21, 2021, or approximately 37.4%.

38.     Defendant Goh has served as a Company director since the Merger. In addition, he serves as Chair of the Finance and Investments Committee and as a member of the Audit Committee. According to the Proxy Statement, Defendant Goh receives annual cash retainers of $50,000 for his service on the Board, $7,500 for his service as Chair of the Finance & Investments Committee, and $10,000 for his service as a member of the Audit Committee, in addition to an annual restricted stock unit award of $150,000.

39.     Defendant Krolicki served on Legacy FF's Board of Directors prior to the Merger and was appointed to the Board of the Company upon the consummation of the Merger. He served as Chairman of the Board and as Chair of the Nominating and Corporate Governance Committee until the conclusion of the Special Committee's investigation, following which he stepped down from those roles and became a member of the Audit and Compensation Committees of the Board. According to the Proxy Statement, Defendant Krolicki receives annual cash retainers for $50,000 for his service on the Board, $10,000 for his service as a member of the Audit Committee, and $6,250 for his service as a member of the Compensation Committee, in addition to a $150,000 annual restricted stock unit

award.

40.     Defendant Liu was appointed to the Company's Board upon the consummation of the Merger. He also serves as Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. According to the Proxy Statement, Defendant Liu receives annual cash retainers of $50,000 for his service on the Board, $10,000 for his service as Chair of the Compensation Committee, and $6,250 for his service as a member of the Compensation Committee, in addition to an annual restricted stock unit award of $150,000.

41.     Defendant Savar served as a director on PSAC's Board from February 2020 until the Merger. Defendant Savar is a member of Sponsor.

42.     Defendant Swenson was appointed to the Company's Board upon the consummation of the Merger, and began serving as Chair of the Audit Committee and as a member of the Compensation Committee. Following the Special Committee's investigation and findings, Defendant Swenson stepped down from the Audit and Compensation Committees and was appointed to the Company's newly created position of Executive Chairperson. As Executive Chairperson of the Company, Defendant Swenson is entitled to a monthly base salary of $100,000 and was awarded stock options for a number of shares equal to $3 million divided by the January 31, 2022 stock price, subject to certain vesting provisions.

43.     Defendant S. Vogel was appointed to the Company's Board upon the consummation of the Merger. Defendant S. Vogel is the brother of J. Vogel, who was Chairman and Co-CEO of PSAC prior to the Merger. Following the Special Committee's investigation and findings, Defendant S. Vogel became the Chair of the Audit Committee and the Nominating and Corporate Governance Committee of the Board. According to the Proxy Statement, Defendant S. Vogel receives an annual cash retainer of $50,000 for his service on the Board, in addition to an annual restricted stock unit award of $150,000. As Chair of the Audit Committee and Nominating and Corporate Governance Committee, he

Verified Shareholder Derivative Complaint

is entitled to annual cash premiums of $15,000 and $7,500, respectively.

44.    Defendant Wang served as Legacy FF's Vice President of Global Capital Markets from May 2018 until the Merger and continued to lead the Capital Markets Department at the Company following the Merger. In addition, he was a director of Legacy FF prior to the Merger. Defendant Wang is the nephew of Defendant Jia. On February 1, 2022, the Company announced that Defendant Wang was suspended without pay in connection with the Special Committee's investigation into inaccurate disclosures. As of March 1, 2020—prior to his suspension without pay—Defendant Wang's annual base salary increased to $380,000, according to the Proxy Statement. Defendant Wang is a manager of FF Global, which, as of the date of the Proxy Statement, controlled Pacific and thereby held 29.1% of Legacy FF's share capital. Pacific indirectly controls FF Top, which held 121,438,964 shares of the Company's common stock as of July 21, 2021, or approximately 37.4%.

45.    Defendant Ye joined Legacy FF in February 2018 and served as its Vice President of Business Development until the Merger. Upon the consummation of the Merger, Defendant Ye became a Company director and continued serving as Vice President of Business Development. According to the Proxy Statement, Defendant Ye's base salary is $300,000 and he is eligible to receive a discretionary annual performance bonus (with a target of $100,000). As of the date of the Proxy Statement, Defendant Ye held 3,632,700 membership units in FF Global. As of the date of the Proxy Statement, FF Global controlled Pacific and thereby held 29.1% of Legacy FF's share capital. Pacific indirectly controls FF Top, which held 121,438,964 shares of the Company's common stock as of July 21, 2021, or approximately 37.4%.

## SUBSTANTIVE ALLEGATIONS

### Background

46.    PSAC, a blank check company, had its initial public offering on July 24, 2020. PSAC sold 20,000,000 of its units at a price of $10.00 per unit, generating gross proceeds

of $200 million. PSAC netted approximately $230 million in gross proceeds through the IPO and certain other transactions conducted in connection with the IPO.

47.     On January 28, 2021, Legacy FF and PSAC announced their entry into a definitive agreement to merge (the "Merger Agreement"), which Merger was consummated on July 21, 2021.

48.     Under the Merger Agreement, shares of Legacy FF and outstanding Legacy FF converting debt were converted into shares of PSAC common stock and, for FF Top, shares of PSAC's Class B common stock.

49.     However, both prior to and after the July 21, 2021 Merger the Individual Defendants made or caused the Company or Legacy FF to make materially false and misleading statements that concealed issues with Operating Faraday and the resulting implications for the Merger and the Company. The Company's stock price was artificially inflated throughout the Relevant Period as a result.

50.     Furthermore, the PSAC Defendants engaged in the Overpayment Misconduct by causing PSAC to acquire Legacy FF despite that entity's numerous issues. What's more, certain of the Individual Defendants failed to timely file the Company's quarterly reports with the SEC.

51.     The Individual Defendants also failed to maintain internal controls at the Company. Specifically, in the Company's Form 10-Q filed on August 13, 2021, the Company disclosed that it had "identified a material weakness in internal controls related to the accounting for our Private Warrants."

**Failure to Timely File Reports with the SEC**

52.     Certain of the Individual Defendants breached their fiduciary duties during the Relevant Period by failing to timely file the Company's quarterly reports on Form 10-Q with the SEC.

53.     For instance, on May 14, 2021, the PSAC Defendants breached their fiduciary duties to the Company by failing to timely file PSAC's quarterly report on Form 10-Q for

the first quarter of 2021. Thus, PSAC filed a Form 12b-25 notifying that it was unable to file its quarterly report.

54.     Also, Defendant McBride and the Board breached their fiduciary duties to the Company by failing to timely file the Company's quarterly report for the third quarter of 2021. Thus, the Company filed a Form 12b-25 on November 15, 2021 notifying that it was unable to file its Form 10-Q for the quarter ended September 30, 2021. It also noted it was unable to file a Form 8-K with the Company's third quarter 2021 earnings press release, or its amended Registration Statement on Form S-1.

**Overpayment Misconduct**

55.     Legacy FF suffered from various undisclosed problems prior to the Merger. For instance, courts had frozen certain of Legacy FF's assets in China, mere hundreds of the claimed 14,000 reservations were paid reservations, a material amount of reservations were attributable to a single undisclosed affiliate, and Legacy FF's cars were not as close to production as claimed.

56.     In light of these issues with Legacy FF, the PSAC Defendants breached their fiduciary duties to PSAC by causing it to merge with Legacy FF on terms that were unfavorable to the Company and its pre-Merger shareholders.

57.     The terms of the Merger were as follows. Legacy FF's pre-Merger stakeholders would own approximately 212.9 million shares, or approximately 66% of the voting control of the post-Merger Company. In exchange, pre-Merger PSAC stockholders would receive 30.2 million shares of the voting control of the post-Merger Company, or approximately 9.4%. The remaining 24.6% of voting control and shares was to be held by investors who purchased PSAC common stock in a private placement. According to the Proxy Statement, after such time as the post-Merger Company, at the end of any 20 consecutive trading days, has a volume weighted average total equity market capitalization of at least $20 billion, the holders of the Company's Class B common stock will be entitled to ten votes for each such share, which will cause Legacy FF stakeholders to own 87.7%

of the voting control of the Company, with PSAC stockholders owning approximately 3.4% of the voting control of the post-Merger Company, and approximately 8.9% of the Company's voting control of the Company being held by the investors purchasing PSAC common stock in a private placement.

58.     Thus, despite the issues plaguing Legacy FF, the terms of the Merger and the consummation thereof resulted in pre-Merger PSAC stockholders owning only a small fraction of the Company's shares and less than 10% of the voting control of the post-Merger Company. In addition, the triggering condition described in the foregoing paragraph illustrates that the Merger was structured to favor Legacy FF stakeholders, since, if the triggering condition were satisfied, Legacy FF stakeholders would own 87.7% of the Company's voting control.

59.     The PSAC Defendants knew or should have known of the poor state of Legacy FF prior to the Merger, due to their ability and responsibility to conduct due diligence prior to the Merger. Despite this enhanced knowledge and/or responsibility, they agreed to the Merger on terms that were unreasonable given the poor and as-of-yet undisclosed state of affairs at Legacy FF.

60.     The PSAC Defendants' culpability is underscored by their failure to obtain a fairness opinion. Specifically, the PSAC Defendants admittedly did not obtain a third-party valuation or fairness opinion in connection with their determination to approve and consummate the Merger. Attempting to justify their decision to forego a third-party valuation or fairness opinion, the PSAC Defendants boasted in the Proxy Statement that their "substantial experience in evaluating the operating and financial merits of companies from a wide range of industries and concluded that their experience and backgrounds, together with the experience and sector expertise of PSAC's financial advisors, enabled them to make the necessary analyses and determinations" concerning the Merger.

61.     However, the PSAC Defendants' interests with respect to the Merger diverged from those of PSAC shareholders, and these diverging interests caused the PSAC

Defendants to prioritize the consummation of the Merger over full due diligence. Specifically, all five of the PSAC Defendants are either members or managing members of Sponsor, which held certain Private Shares that would become worthless in the event PSAC failed to consummate a transaction by April 24, 2022. In consummating the Merger without a fairness opinion, the PSAC Defendants placed their own self-interest over the interest of the Company and the pre-Merger Company's shareholders. They agreed to the Merger on less favorable terms than were reasonable, given the poor state of Legacy FF, which would only later become publicly known.

62.     Thus, breaching their fiduciary duties, the PSAC Defendants engaged in the Overpayment Misconduct. Specifically, they caused PSAC to acquire Legacy FF on unfavorable terms to PSAC shareholders even though, *inter alia*: (1) Legacy FF was not as close to vehicle production as claimed; (2) certain of Legacy FF's assets in China had been frozen by courts; (3) only several hundred of Legacy FF's 14,000 touted reservations were paid reservations, while others were merely unpaid indications of interest; and (4) a material number of Legacy FF's reservations for future vehicle deliveries were attributable to an affiliate that was undisclosed.

**False and Misleading Statements**

63.     On January 28, 2021, PSAC and Legacy FF issued a press release announcing the Merger Agreement. The press release noted that the merged Company would be listed on NASDAQ, and it further provided as follows:

> This transaction validates FF's vision to create a mobility ecosystem built upon innovations in technology and products. FF's flagship product offering will be the FF 91, featuring industry leading 1,050 HP, 0-60 mph in less than 2.4 seconds, zero gravity seats with the largest 60-degree reclining angles and a revolutionary user experience designed to create a mobile, connected, and luxurious third Internet living space. FF 91 is targeted to launch within twelve months after closing of the merger.

> Commenting on today's significant milestones, Faraday Future's Global Chief Executive Officer, Dr. Carsten Breitfeld said, "We are excited to enter

into this partnership with PSAC. This is an important milestone in our company's transformation, one that we achieved with strong commitment from our employees, suppliers, and partners in the U.S. and China, as well as the city of Hanford, California. I am excited that this business combination will allow us to launch the class defining FF 91, building upon the founder's original vision to help our users and shareholders take part in shaping the future of mobility."

"Faraday Future is a unique and differentiated electric vehicle company with significant growth prospects for the future," said Property Solutions Co-CEO and Chairman Jordan Vogel. "We believe the excellent management team, led by Dr. Breitfeld, and industry-leading technology will allow Faraday Future to reach its true growth potential."

FF has invested over $2 billion dollars since its inception. In addition to the development of its first model FF 91, the product definition of the second model FF 81 has been completed, and the R&D work is progressing.

64.    The January 28, 2021 press release also touted vehicle delivery timelines and in particular touted "14,000 reservations" for Legacy FF's leading model, the FF 91:

FF's B2C passenger vehicle launch pipeline over the next five years includes FF 91 series, FF 81 series, and FF 71 series. FF 91 will define the FF brand DNA. This DNA will carry over to subsequent premium mass market vehicles in the portfolio - the FF 81, and FF 71. With such brand DNA, FF products are expected to be ahead of the competition in their respective segments in terms of their design, driving experience, interior comfort, connectivity, and user experience. FF 81 is expected to launch in 2023, and FF 71 in 2024. In addition to passenger vehicles, FF plans to launch a Smart Last Mile Delivery ('SLMD') vehicle in 2023 leveraging its proprietary VPA. To implement a capital light business model, FF has adopted a global hybrid manufacturing strategy consisting of its refurbished manufacturing facility in Hanford, California and collaboration with a leading contract manufacturing partner in South Korea. The company is exploring the possibility of additional manufacturing capacity in China through a joint venture.

As the world's only tech-luxury intelligent Internet electric vehicle brand, ***FF expects to sell more than 400,000 units cumulatively over the next five years, and its first flagship model, the FF 91, has received over 14,000 reservations.***

(Emphasis added.)

65.    On March 19, 2021, PSAC filed a transcript with the SEC from a question-and-answer ("Q&A") session with news company *IPO Edge*. In the Q&A, the Company stated:

> ***FF has the most exciting growth opportunity ahead in the EV market. The transaction is expected to fully fund the production of our flagship halo vehicle, the luxury electric FF 91, within 12 months of close.*** The FF 91 is scheduled to launch in 2022, making our market disrupting product a relatively near-term reality. Our technology has been tested by the world's leading experts, who believe we have an edge that can transform the market with unparalleled performance. FF is led by a world-class management team with deep automotive, software, and internet experience.
>
> ***We have existing demand for the FF 91 by way of more than 14,000 reservations, and a strong strategy to scale in the US and China.*** The strong signal we are seeing from China significantly expands the opportunity ahead for FF, evidenced by the fact that we have a Tier 1 city and a top three Chinese OEM participating in the PIPE financing. These strategic partners will help establish FF's presence in the Chinese market, further solidifying FF's unique US-China dual home market strategy.

(Emphasis added.)

66.    On April 5, 2021, PSAC filed its registration statement on Form S-4 with the SEC (the "Registration Statement"). The Registration Statement touted "vehicle development milestones" Legacy FF had achieved with respect to the FF 91:

> FF intends to commercially launch FF 91 series within twelve months after closing of the Business Combination. Toward that goal, FF has completed most of the vehicle development milestones, including 29 prototype and 13 pre-production assets. FF 91 series is designed to compete with Maybach, Bentley Bentayga, Lamborghini Urus, Ferrari Purosangue, Mercedes S-Class, Porsche Taycan, BMW 7-Series etc.

67.    Listing Legacy FF's purported "Competitive Strengths," the Registration Statement included the following: "Speed to market with the ability to launch commercial production within 12 months after the Business Combination." Immediately below this

statement, the Registration Statement stated the following:

> FF has achieved major commercial milestones to bring its FF 91 model to the market. Unlike many competitors, FF has the advantage of speed to market as it is positioned to launch a production try-out in 9 months and commercial production of FF 91 series within 12 months after the Business Combination. FF has completed 29 prototypes and 13 pre-production assets and has completed most of the vehicle development hurdles including feasibility, concept and development phases. As of the date hereof, 94% of the key components for FF 91 have been sourced, 91% production tooling is complete and 75% of production equipment is complete.

68. On June 24, 2021, the Company filed the Proxy Statement with the SEC. The PSAC Defendants solicited the Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, and the Proxy Statement contained material misstatements and omissions. The Proxy Statement also contained a Notice of Solicitation of Written Consents or Proxies from Legacy FF's Board of Directors to shareholders of Legacy FF.

69. The Proxy Statement announced the forthcoming July 20, 2021 special meeting of stockholders and solicited PSAC stockholders to: (1) approve the Merger; (2) approve amendments to PSAC's certificate of incorporation; (3) elect nine directors to the post-Merger Board; (4) approve, for purposes of complying with NASDAQ listing rules, the issuance of PSAC common stock to certain investors and institutional buyers in private placements (the "NASDAQ Proposal"); and (5) approve Faraday's 2021 Stock Incentive Plan (the "2021 Plan").

70. The Proxy Statement listed Legacy FF's "Competitive Strengths" as including: "Speed to market with the ability to launch commercial production within 12 months after the Business Combination." Below this statement touting Legacy FF's production timeline, the Proxy Statement stated as follows:

> FF has achieved major commercial milestones to bring its FF 91 model to the market. Unlike many competitors, ***FF has the advantage of speed to market as it is positioned to launch a production try-out in 9 months and commercial production of FF 91 series within 12 months after the Business Combination.***

(Emphasis added.)

71.     Regarding the post-Merger Board's risk oversight functions, the Proxy Statement stated as follows:

> New FF's board of directors will oversee the risk management activities designed and implemented by management. New FF's board of directors will execute its oversight responsibility both directly and through its committees. New FF's board of directors will also consider specific risk topics, including risks associated with its strategic initiatives, business plans and capital structure. New FF's management, including its executive officers, is primarily responsible for managing the risks associated with the operation and business of the company and will provide appropriate updates to the board of directors and the audit committee. New FF's board of directors will delegate to the audit committee oversight of its risk management process, and its other committees will also consider risk as they perform their respective committee responsibilities. All committees will report to the board of directors as appropriate, including when a matter rises to the level of material or enterprise risk.

72.     The Proxy Statement also listed certain responsibilities of the post-Merger Company's Audit Committee, the members of which were identified as Defendants Swenson (as Chair), Goh, and S. Vogel. The Proxy Statement stated:

> The purpose of the audit committee will be, among other things, to appoint, retain, set compensation of, and supervise New FF's independent registered public accounting firm, review the results and scope of the audit and other accounting related services and review New FF's accounting practices and systems of internal accounting and disclosure controls.

73.     The statements referenced in ¶¶ 71–72 were false and misleading because, given Legacy FF's issues, which were undisclosed but about which the PSAC Defendants and the Legacy FF Defendants knew or should have known, it was not reasonable to state that the post-Merger Board and Audit Committee would exercise risk oversight, review accounting practices, and review accounting and disclosure controls.

74.     The Proxy Statement also stated the following concerning the administration of the 2021 Plan:

> The 2021 Plan will be administered by the compensation committee of the New FF board of directors, or a subcommittee thereof, or such other

committee designated by the New FF board of directors (the "Plan Committee"), in each case consisting of two or more members of the New FF board of directors. Each member of the Plan Committee is intended to be (i) a "non-employee director" within the meaning of Rule 16b-3 under the Exchange Act, and (ii) "independent" within the meaning of the rules of Nasdaq.

Subject to the express provisions of the 2021 Plan, the Plan Committee has the authority to select eligible persons to receive awards and determine all of the terms and conditions of each award. All awards are evidenced by an agreement containing such provisions not inconsistent with the 2021 Plan as the Plan Committee approves. The Plan Committee also has authority to establish rules and regulations for administering the 2021 Plan and to decide questions of interpretation or application of any provision of the 2021 Plan. The Plan Committee may take any action such that (i) any outstanding options and SARs become exercisable in part or in full, (ii) all or any portion of a restriction period on any outstanding awards lapse, (iii) all or a portion of any performance period applicable to any awards lapse, and (iv) any performance measures applicable to any outstanding awards be deemed satisfied at the target, maximum or any other level.

The Plan Committee may delegate some or all of its power and authority under the 2021 Plan to the New FF board of directors, a subcommittee of the New FF board of directors, a member of the New FF board of directors, the Chief Executive Officer or other executive officer of New FF as the Plan Committee deems appropriate, except that it may not delegate its power and authority to a member of the New FF board of directors, the Chief Executive Officer or any executive officer with regard to awards to persons subject to Section 16 of the Exchange Act.

75.   The Proxy Statement provided as follows regarding eligibility for the 2021 Plan:

> ***Participants in the 2021 Plan will consist of such officers, other employees, non-employee directors, consultants, independent contractors and agents of New FF and its subsidiaries (and such persons who are expected to become any of the foregoing) as selected by the Plan Committee.*** The aggregate value of cash compensation and the grant date fair value of shares of common stock that may be awarded or granted during any fiscal year of New FF to any non-employee director will not exceed $750,000. As of March 18, 2021, approximately 345 employees and 1 non-employee director are eligible to participate in the 2021 Plan if selected by the Plan Committee to participate.

Verified Shareholder Derivative Complaint

(Emphasis added.)

76. The Proxy Statement was materially misleading because it failed to disclose the following: (1) the PSAC Defendants were breaching their fiduciary duties to PSAC by failing to exercise risk oversight functions at PSAC and by causing or permitting PSAC to issue false and misleading statements; (2) the post-Merger Board and Audit Committee would not adequately exercise these functions and would cause or permit the Company to issue false and misleading statements, as discussed *supra* ¶ 73; and (3) Defendant J. Vogel—a member of the PSAC Board who had breached his fiduciary duties—was improperly interested in increasing his compensation and the compensation of his brother S. Vogel by seeking shareholder approval of the 2021 Plan.

77. The Proxy Statement also failed to disclose that: (1) Legacy FF was not as close to vehicle production as claimed; (2) certain of Legacy FF's assets in China had been frozen by courts; (3) only several hundred of Legacy FF's 14,000 touted reservations were paid reservations, while others were merely unpaid indications of interest; (4) a material number of Legacy FF's reservations for future vehicle deliveries were attributable to a single affiliate that was undisclosed; (5) as a result of the foregoing, the post-Merger Company would be unable to file its quarterly report for the third quarter of 2021; and (6) the Company failed to maintain internal controls.

78. As a result of the false and misleading elements of the Proxy Statement, shareholders elected Defendants Aydt, Breitfeld, Krolicki, J. Vogel, and Ye to the Board, each one of which had breached their fiduciary duties to the Company or had aided and abetted such breaches. Their election allowed them to breach their fiduciary duties to post-Merger Faraday. As a further result of the false and misleading elements of the Proxy Statement, shareholders elected Defendants Goh, Liu, Swenson, and S. Vogel to the Board, who then breached their fiduciary duties to the Company. Furthermore, as a result of the Proxy Statement's false and misleading elements, shareholders approved the Merger, approved amendments to PSAC's certificate of incorporation, approved the 2021 Plan, and

approved the NASDAQ Proposal.

79.     After the Merger was consummated on July 21, 2021, on September 19, 2021, the Company gave a business update at its "919 Futurist Day" event. The business update included presentation materials that the Company attached to a Form 8-K filed with the SEC on September 20, 2021. The Company stated as follows in the presentation materials:

> The transaction is expected to fully fund the production of class-defining performance luxury electric FF 91 within 12 months of transaction close. This transaction also supports the future development of the Company's unique I.A.I (Internet, Autonomous Driving, Intelligence) system.

80.     The presentation materials further stated: "Faraday Future's advanced manufacturing and factory operations teams have made significant progress with the support of our equipment suppliers in preparing the Hanford factory for the launch of the FF91."

81.     The statements referenced in ¶¶ 63–67 and 79–80 were materially false and misleading because the Individual Defendants failed to disclose, *inter alia*, that: (1) Operating Faraday was not as close to vehicle production as claimed; (2) certain of Operating Faraday's assets in China had been frozen by courts; (3) only several hundred of Operating Faraday's 14,000 touted reservations were paid reservations, while the others were merely unpaid indications of interest; (4) a material number of Operating Faraday's reservations for future vehicle deliveries were attributable to a single affiliate that was undisclosed; (5) as a result of the foregoing, the Company would be unable to file its quarterly report for the third quarter of 2021; and (6) the Company failed to maintain internal controls.

### **Truth Begins to Emerge While False and Misleading Statements Continue**

82.     On October 7, 2021, the truth began to emerge. J Capital published the Report, which maintained that, *inter alia*: (1) Operating Faraday was not as close to vehicle production as claimed; (2) certain of the Company's assets in China had been frozen by courts; and (3) a material portion of the Company's reservations for future vehicle

deliveries were attributable to a single affiliate that was undisclosed.

83.     The Report noted that Operating Faraday had reneged on promised factory construction, had left suppliers unpaid, and had issues with purported reservations:

> We don't think Faraday Future (FFIE), an EV SPAC, will ever sell a car. So far, it's nothing but a bucket to collect money from U.S. investors and pour it into the black hole of debt created by its founder, China's best-known securities fraudster, Jia Yueting.
>
> After eight years in business, FFIE has failed to deliver a car and is yet again saying "next year." The company has reneged on promises to build factories in five localities in the U.S. and China and repeatedly delayed the sixth. FFIE is being sued by dozens of unpaid suppliers and has failed to disclose that assets in China have been frozen by courts. And Jia appears to be running the company behind the scenes.
>
> Given the current bubble environment, FFIE nevertheless managed to raise about $1 bln from U.S. investors via PIPEs and SPAC merger in July. Now it promises to restart its abandoned factory in Hanford, California and mass-produce cars in just seven months. We doubt that timeline will hold: three recent visits to the factory showed little activity, and company formers told us there are still engineering problems to work out.
>
> FFIE is the malformed lovechild of the imperiled Chinese real estate developer Evergrande (3333 HK) and Jia, China's fugitive default king. We expect Evergrande, which owns 20.5% of this company and stands to gain more equity, to sell off its shares as soon as the lockup period ends, in January 2022 if not, quietly, before that.
>
> ***In January 2021, the company claimed it had 14,000 reservations for the car—until one week after Hindenburg published its findings that Lordstown's orders were faked. Without explanation, after March 19, FFIE no longer made reference to the number of reservations. In fact, these reservations--78% of which were from a single company—had been converted in 2020 to a note payable earning 8% interest. The company strongly implies that the mystery booker, who was apparently ready to spend well over $1 bln on FFIE cars, may be an "affiliate." They fail to say who it was. In H1 2021, despite the upcoming SPAC merger, FFIE took in just $144,000 in new customer deposits.***

(Emphasis added and footnotes omitted.)

84.     The Report alleged that the FF 91 wasn't ready for production:

On September 20, 2021, the company issued a new presentation claiming progress toward manufacturing. But ***former engineering executives we interviewed did not believe that the car was ready for production.*** FFIE's contention that it needed just $90 mln to start mass production in seven months is "not even in the ballpark of true," said one formerly highly placed executive. Another former executive said, "The story with the SPAC is that they just needed money to manufacture, but I think there are still some critical engineering issues."

Chinese government reports show that in 2016, FFIE's subsidiary LeSee put $154 mln into the company's largest planned manufacturing site, in China's Zhejiang Province, but we visited the location and found nothing but an overgrown field. The area is so deserted that even the police station in what was intended to be the Faraday factory park has closed.

(Emphasis added.)

85.     The Report also revealed issues regarding certain frozen assets:

***Jia Yueting, FFIE founder, has been banned for life from being associated with publicly listed companies in China.*** FFIE admits in its "risks" section that he has "illegally" provided funding and guarantees to affiliated companies, improperly diverted proceeds from the public offering of a company he controlled, and lied to Chinese regulators and investors. In Hong Kong, where he was chairman of the long-halted Coolpad Group Limited (2369 HK), he failed to disclose key transactions.

***Holding the title "Partner, Chief Product & User Ecosystem Officer," Jia still controls key spending decisions at FFIE through the FF Global Executive Committee. Because of him, FFIE's USD accounts in China have been frozen by regulators.*** In a lawsuit against FFIE, the company's former General Counsel Hong Liu claimed that a Jia "clique" controlled the company regardless of legal commitments.

Embarrassed by Jia, FFIE hired a "professional" CEO in September 2019, but his track record in Chinese EVs is not much better. Carsten Breitfeld was co-founder of Nanjing-based Byton, which owed suppliers and employees millions of dollars when it stopped operating in 2020. He conveniently omits from his bio in the prospectus his ill-fated tenure as CEO of another Chinese EV hopeful called Iconiq, which raised over ¥1.2 bln before going silent. He gets tepid reviews from formers.

In the current overheated EV environment, the company appears to be having difficulty finding talent. In September, FFIE announced new executives: one from Lordstown—the company an FFIE former said "is setting new standards for fraud"--and two from Karma, a moribund company that the auto news site Jalopnik claims may have faked prototypes. One of the Karma graduates is an ex-vice president of A123 Systems, a formerly U.S.-listed Chinese company that has been sued multiple times for patent infringement and securities fraud.

(Emphasis added.)

86.     On this news, the price of the Company's common stock fell $0.35 per share from its closing price on October 6, 2021 to close at $8.05 per share on October 8, 2021, a decline of approximately 4.2%.

87.     Faraday announced on November 2, 2021 that Defendant Glasman had resigned as CFO of the Company effective October 27, 2021. The Company further announced that, effective as of November 1, 2021, Defendant McBride was appointed to succeed Defendant Glasman. In a press release announcing these changes, the Company stated, "Mr. McBride succeeds Zvi Glasman, who resigned as CFO of the company to pursue other opportunities." The press release was also attached to a Form 8-K filed with the SEC that stated, "Mr. Glasman's departure from the Company is not a result of any disagreement with the Company's independent auditors or any member of management on any matter of accounting principles or practices, financial statement disclosure, or internal controls."

88.     The statements referenced in the ¶ 87 were materially false and misleading because the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) as a result of the material misstatements and omissions discussed herein, the Company could not timely file its quarterly report for the third quarter of 2021; and (2) the Company failed to maintain adequate internal controls. As a result, the Company's statements were materially false and misleading at all relevant times.

## **The Truth Emerges**

89.     On November 15, 2021, Faraday issued a press release providing a business

update. The Company disclosed that it could not timely file its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended September 30, 2021. The press release further stated that Faraday's Board had "formed a special committee of independent directors to review allegations of inaccurate disclosures," and referenced the J Capital Report:

> Faraday Future Intelligent Electric Inc. ("Faraday Future" or the "Company") (NASDAQ: FFIE), a California-based global shared intelligent electric mobility ecosystem company, filed a Form 12b-25 notifying the SEC that it is unable to file its Form 10-Q for the fiscal quarter ended September 30, 2021 within the prescribed time period, and does not expect to file it by the extended filing date pursuant to Rule 12b-25. The Company is also unable to file its amended Registration Statement on Form S-1 (File No. 333-258993) (the "Form S-1/A") at this time.

> The Company's Board of Directors formed a special committee of independent directors to review allegations of inaccurate disclosures, including claims made in a report issued by an investor with a history of seeking to drive down public companies' stock prices for its own benefit. Faraday Future seeks to do business in the most ethical and transparent way. As a new public company, the Board, as part of its review, is seeking to ensure that the Company is adhering to the highest standards of conduct.

> The special committee's review is ongoing, and it is working diligently with independent counsel and advisors to complete its review as soon as possible. The Company is committed to working with the special committee to complete its work in order to re-establish timely financial reporting as soon as feasible. Until the review is complete, the Company is not able to file its Form 10-Q or Form S-1/A.

90.    On this news, the price per share of the Company's common stock fell $0.28 from its closing price of $9.11 on November 15, 2021 to close at $8.83 per share on November 16, 2021, a loss of approximately 3%.

## Developments After the Relevant Period

91.    On February 1, 2022, the Company issued a press release announcing the conclusion of the Special Committee's investigation and the resulting findings.

92.     The press release first stated that "the Special Committee found that statements made by certain Company employees to certain investors describing Mr. Jia's role within the Company were inaccurate," and that Defendant Jia's involvement in the post-Merger Company "was more significant than what had been represented to certain investors." The Special Committee's second finding was that statements to the effect that Operating Faraday "had received more than 14,000 reservations for the FF 91 vehicle were potentially misleading because only several hundred of those reservations were paid, while the others (totaling 14,000) were unpaid indications of interest." The Special Committee also found that, "[c]onsistent with the Company's previous public disclosures regarding identified material weaknesses in its internal controls, the Company's internal controls over financial accounting and reporting require an upgrade in personnel and systems." Lastly, the Special Committee found that "[t]he Company's corporate culture failed to sufficiently prioritize compliance."

93.     The Board implemented remedial actions as a result of the Special Committee's findings, including the following, among others: (1) Defendant Swenson was appointed to the new position of Executive Chairperson; (2) Defendants Breitfeld and Jia began reporting directly to Defendant Swenson and would each receive 25% salary reductions; (3) Defendant J. Vogel became Lead Independent Director; (4) Defendant Krolicki stepped down from his service as Board Chairman; (5) Defendant S. Vogel became Chair of the Audit Committee and the Nominating and Corporate Governance Committee; (6) Jarret Johnson, Vice President, General Counsel and Secretary, will be separating from the Company; and (7) Defendant Wang was suspended without pay until further notice.

## DAMAGES

94.     Faraday has lost and will continue to lose and expend many millions of dollars as a direct and proximate result of the Individual Defendants' misconduct.

95.     These losses include, but are not limited to, fees associated with the Securities

Class Action filed against the Company and six of the Individual Defendants, as well as any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

96. These losses also include, in light of the poor state of affairs at Legacy FF described herein, the amount PSAC overpaid for Legacy FF.

97. These losses also include payments the Individual Defendants received under the 2021 Plan, which was approved by shareholders at least in part due to false and misleading statements that the Individual Defendants issued or caused to be issued.

98. These losses further include expenses related to the Company's failure to timely file reports with the SEC and to maintain internal controls.

99. Additionally, these losses include compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

100. Faraday has also suffered and will continue to suffer a loss of reputation and goodwill as a direct and proximate result of the Individual Defendants' conduct, as well as a "liar's discount" that will plague Faraday's stock in the future due to the Company's and the Individual Defendants' misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

101. Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

102. This action is brought derivatively and for the Company's benefit to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of the Company, violations of Section 14(a) of the Exchange Act, the aiding and abetting thereof, as well as for contribution under Sections 10(b) and 21D of the Exchange Act.

103. Faraday is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

104.   Plaintiff is a shareholder of Faraday and purchased Company stock during the beginning of the Relevant Period. Plaintiff will adequately and fairly represent the Company's interests in enforcing and prosecuting its rights. To that end, Plaintiff has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

105.   A pre-suit demand on the Company's Board is excused as being futile. At the time of this filing, the Board consists of nine directors: Defendants Breitfeld, Aydt, Goh, Krolicki, Liu, Swenson, J. Vogel, S. Vogel, and Ye (collectively, the "Directors"). Plaintiff needs only to allege demand futility as to five of the Board's nine who are serving at the time of the commencement of this action.

106.   Demand is excused as to all of the Directors because each faces, individually and collectively, a substantial likelihood of liability as a result of the schemes described herein. They knowingly or recklessly engaged in these schemes to make and/or cause the Faraday to make false and misleading statements and omissions of material facts, to fail to timely file reports with the SEC, and to cause PSAC to engage in the Overpayment Misconduct. As a result, the Directors are unable to impartially investigate the charges and decide whether to pursue action against themselves and the schemes' other perpetrators. These acts were in complete abdication of the Individual Defendants' fiduciary duties, and the schemes were intended to make Faraday appear more profitable and attractive to the investing public. Moreover, the Directors caused Faraday to fail to maintain internal controls. Thus, the Directors breached their fiduciary duties, face a substantial likelihood of liability, and are not disinterested. Accordingly, demand upon them is futile, and thus excused.

107.   Demand on Defendant Breitfeld is futile for the additional following reasons. Defendant Breitfeld was CEO and a director of Legacy FF, and he held those roles at the Company following the Merger, as well. He is also a member of the Finance and Investment Committee. Therefore, he is a non-independent director, as the Company

admits. As CEO of Legacy FF and of the post-Merger Company, he was ultimately responsible for all of the false and misleading statements and omissions that were made during the Relevant Period by Legacy FF prior to the Merger—when the Legacy FF Defendants were aiding and abetting the PSAC Defendants' breaches of fiduciary duty— and by the Company following the Merger. These include the false and misleading statements in the Proxy Statement, which was solicited in part by the Board of Legacy FF, on which Defendant Breitfeld served. The Proxy Statement's false and misleading elements contributed to Defendant Breitfeld being elected to the Board. The Company provides Defendant Breitfeld with his principal occupation as CEO, a position in which he receives handsome compensation. This compensation includes a base salary that reached $2.25 million prior to the conclusion of the investigation by the Special Committee. As a result of his involvement at the Company and the compensation that accompanies such involvement, Defendant Breitfeld cannot disinterestedly consider a demand to sue himself, the directors that control his continued employment, or other members of management with whom he worked or still works. Additionally, Defendant Breitfeld is named as a defendant in the Securities Class Action. As the highest officer of Operating Faraday, and as a trusted director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements. Furthermore, he consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme described herein and consciously disregarded his duties to protect corporate assets. Indeed, he aided and abetted the PSAC Defendants' breaches of fiduciary duty prior to the Merger, including PSAC's engagement in the Overpayment Misconduct. He also he failed to correct the false and misleading statements during the Relevant Period. Thus, Defendant Breitfeld breached his fiduciary duties to the Company, faces a substantial likelihood of liability, and is not independent or disinterested. Accordingly, demand upon him is excused as being futile.

108.   Demand on Defendant Aydt is futile for the additional following reasons. Defendant Aydt has served as Operating Faraday's Senior Vice President of Business

Development and Product Definition from November 2019 until the present. In addition, he was a director of Legacy FF and is now a Company director. His role as Senior Vice President of Business Development and Product Definition results in him being a non-independent director, as the Company admits. As a member of the Board and as an officer and director of Legacy FF, Defendant Aydt has significant culpability for the false and misleading statements issued during the Relevant Period. These statements include those in the Proxy Statement, which was solicited by the Boards of both PSAC and Legacy FF. Defendant was elected to the Board at least in part due to the false and misleading elements of the Proxy Statement. Defendant has his principal occupation with the Company, for which he receives handsome compensation, including a base salary of $400,000. As a result of his roles at Legacy FF and the Company, Defendant Aydt cannot disinterestedly consider a demand to sue himself, the directors that control his continued employment, or other members of management with whom he worked or still works. As a trusted Company director and a senior executive since 2019, Defendant Aydt conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements. Furthermore, he consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme described herein and consciously disregarded his duties to protect corporate assets. Additionally, he aided and abetted the PSAC Defendants' breaches of fiduciary duty prior to the Merger, including PSAC's engagement in the Overpayment Misconduct. He also failed to correct the false and misleading statements during the Relevant Period. Thus, Defendant Aydt breached his fiduciary duties to the Company, faces a substantial likelihood of liability, and is not independent or disinterested. Accordingly, demand upon him is excused as being futile.

109.   Demand on Defendant Goh is futile for the additional following reasons. Defendant Goh has served on the Board since the Merger, and he serves as Chair of the Finance and Investments Committee and as a member of the Audit Committee. Defendant Goh receives significant compensation from the Company for his service on the Board, as

discussed above. As a trusted member of the Board, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements. Furthermore, he consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme described herein and consciously disregarded his duties to protect corporate assets. In addition, Defendant Goh failed to correct the false and misleading statements during the Relevant Period. Thus, Defendant Goh breached his fiduciary duties to the Company, faces a substantial likelihood of liability, and is not independent or disinterested. Accordingly, demand upon him is excused as being futile.

110. Demand on Defendant Krolicki is futile for the additional following reasons. Defendant Krolicki served as Chairman of the Board after the Merger. Currently, he is a member of the Board's Audit Committee and Compensation Committee. In addition, he served on Legacy FF's Board prior to the Merger. Defendant Krolicki is entitled to significant compensation for his service on the Board, as discussed above. As a trusted member of the Board, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements. Furthermore, he consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme described herein and consciously disregarded his duties to protect corporate assets. He also aided and abetted the breaches of fiduciary duty by the PSAC Defendants prior to the Merger, including PSAC's engagement in the Overpayment Misconduct. Moreover, he failed to correct the false and misleading statements during the Relevant Period. Thus, Defendant Krolicki breached his fiduciary duties to the Company, faces a substantial likelihood of liability, and is not independent or disinterested. Accordingly, demand upon him is excused as being futile.

111. Demand on Defendant Liu is futile for the additional following reasons. Defendant Liu has served as a Company director since the Merger. In addition, he serves as Chair of the Compensation Committee and is also a member of the Nominating and Corporate Governance Committee. He receives significant compensation from the

Company for his service on the Board, as detailed above. As a trusted member of the Board, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements. Furthermore, he consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme described herein and consciously disregarded his duties to protect corporate assets. He also failed to correct the false and misleading statements during the Relevant Period. Thus, Defendant Liu breached his fiduciary duties to the Company, faces a substantial likelihood of liability, and is not independent or disinterested. Accordingly, demand upon him is excused as being futile.

112.    Demand on Defendant Swenson is futile for the additional following reasons. Defendant Swenson is currently the Company's Executive Chairperson. She served during the Relevant Period—following the Merger—as a member of the Board, as Chair of the Audit Committee, and as a member of the Compensation Committee. Defendant Swenson has received significant compensation for her service on the Board and now receives significant compensation for her service as the Company's Executive Chairperson, as detailed above. As a trusted Company director during the Relevant Period, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements. She also consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme described herein and consciously disregarded her duties to protect corporate assets. Furthermore, she failed to correct the false and misleading statements during the Relevant Period. Thus, Defendant Swenson breached her fiduciary duties to the Company, faces a substantial likelihood of liability, and is not independent or disinterested. Accordingly, demand upon her is excused as being futile.

113.    Demand on Defendant J. Vogel is futile for the additional following reasons. Defendant J. Vogel is the brother of Defendant S. Vogel. He served as PSAC's Chairman and Co-CEO from its inception until the Merger, when he joined the Company's Board. Thus, he served as a director of the Company throughout the Relevant Period. He is a member of the Compensation Committee and the Nominating and Corporate Governance

Committee, and has recently been appointed to the position of Lead Independent Director. In addition, he is a managing member of Sponsor. As PSAC's Co-CEO prior to the Merger, Defendant J. Vogel shared ultimate responsibility for all the Company's false and misleading statements and omissions made prior to the Merger. Moreover, he was a director of the Company following the Merger, when further false and misleading statements issued, under the authority of the Board. The Proxy Statement was solicited on Defendant J. Vogel's behalf, and the Proxy Statement's false and misleading elements contributed to his reelection to the Board. Moreover, the false and misleading statements in the Proxy Statement led PSAC shareholders to approve the 2021 Plan. Under the 2021 Plan certain agents of the Company and its subsidiaries were eligible for lucrative long-term equity incentives. These agents, selected by the Board or one of its subcommittees, include "officers, other employees, non-employee directors, consultants, independent contractors and agents." Because of the possibility that either Defendant J. Vogel or his brother Defendant S. Vogel could receive awards of equity incentives under the 2021 Plan, Defendant J. Vogel is not reasonably likely to investigate the Proxy Statement's false and misleading elements. Moreover, Defendant J. Vogel receives significant compensation from the Company for his service on the Board, as described above. He served as PSAC's Co-CEO and as a director of the Company following the Merger. Despite holding those trusted positions, Defendant J. Vogel conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements and to engage in the Overpayment Misconduct. Moreover, he consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme described herein, and he consciously disregarded his duties to protect corporate assets. He also failed to correct the false and misleading statements during the Relevant Period, and he engaged in the Overpayment Misconduct. Moreover, he violated PSAC's Code of Ethics by engaging in the wrongdoing described herein. Thus, Defendant J. Vogel breached his fiduciary duties to the Company, faces a substantial likelihood of liability, and is not independent or

disinterested. Accordingly, demand upon him is excused as being futile.

114.    Demand on Defendant S. Vogel is futile for the additional following reasons. Defendant S. Vogel is the brother of Defendant J. Vogel. He has served as a member of the Board since the Merger, and he receives significant compensation from the Company for his service as a director. As a trusted member of the Board, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements. In addition, he consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme described herein, and he consciously disregarded his duties to protect corporate assets. Furthermore, he failed to correct the false and misleading statements during the Relevant Period. Thus, Defendant S. Vogel breached his fiduciary duties to the Company, faces a substantial likelihood of liability, and is not independent or disinterested. Accordingly, demand upon him is excused as being futile.

115.    Demand on Defendant Ye is futile for the additional following reasons. Defendant Ye has served as Vice President of Business Development at Operating Faraday since February 2018, when he joined Legacy FF. In addition, he became a member of the Board following the Merger. Defendant Ye receives significant compensation for his roles at Faraday, including a salary of $300,000. Thus, he is a non-independent director, as the Company admits. As a trusted member of the Board, he conducted little, if any, oversight of the scheme to cause Faraday to make false and misleading statements. He also consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme described herein, and he consciously disregarded his duties to protect corporate assets. Furthermore, he aided and abetted the breaches of fiduciary duty by the PSAC Defendants prior to the Merger, which included PSAC's engagement in the Overpayment Misconduct. He also failed to correct the false and misleading statements during the Relevant Period. Thus, Defendant Ye breached his fiduciary duties to the Company, faces a substantial likelihood of liability, and is not independent or disinterested. Accordingly, demand upon him is excused as being futile.

116.   Demand on the Board is futile for the additional following reasons.

117.   As announced on November 15, 2021, the Company created the Special Committee to investigate allegations of inaccurate disclosures. The results of the investigation were announced on February 1, 2022. However, the reforms implemented as a result of the investigation were modest. The most severe reforms the Company took were suspending Defendant Wang without pay, and causing the separation of Jarret Johnson, Vice President, General Counsel and Secretary, from the Company. In adopting remedial actions at a January 31, 2022 meeting, the Board did not initiate litigation against any of the alleged wrongdoers to recover for the harm the Company suffered or will suffer. Thus, with knowledge of the Special Committee's findings, the Board failed to take appropriate action on the Company's behalf. Accordingly, because it has already declined to do so, the Board cannot reasonably be expected to bring suit to redress the misconduct described herein. Demand against the Board is therefore excused as being futile.

118.   As the Company's officers and/or directors, the members of the Board are eligible to receive long-term equity incentives through the 2021 Plan. The 2021 Plan was approved by shareholders at least in part due to the false and misleading statements in the Proxy Statement, which was solicited by the PSAC Defendants. Moreover, the Proxy Statement also constituted a Notice of Solicitation of Written Consents or Proxies by the directors of Legacy FF, who aided and abetted the breaches of fiduciary duty by the PSAC Defendants. Because the Directors are eligible to receive increased compensation under the 2021 Plan, they cannot Independently and disinterestedly investigate the misconduct of the PSAC Defendants or the Legacy FF directors in issuing the false and misleading statements that led shareholders to approve the 2021 Plan. Accordingly, demand upon the Directors is excused as being futile.

119.   The Directors are precluded from acting independently and in the best interest of the Company and the Company's shareholders because of longstanding business, personal, and familial relationships between the Directors and between the Directors and

other Individual Defendants. Defendants J. Vogel and S. Vogel are brothers, and therefore are completely precluded from independently evaluating whether to initiate action against one another. Moreover, as evidenced by the findings of the Special Committee's investigation, Defendant Wang is a primary wrongdoer in the misconduct described herein and is also the nephew of Legacy FF founder Defendant Jia. Because of Defendant Jia's unique standing as Legacy FF's founder, the Directors are unlikely to take action against him or against Defendant Wang, his nephew. This is particularly true given that the Special Committee's findings included the finding that Defendant Jia's "involvement in the management of the Company post-Business Combination was more significant than what had been represented to certain investors." These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Directors is excused as being futile.

120.   Certain of the Directors are also connected through FF Global. FF Global influences the Company's management through FF Global's issuance of equity interests as additional compensation to Company management. The Proxy Statement notes that FF Global is managed by an eight-member executive committee which, as of the time of the Proxy Statement, included Defendants Jia, Aydt, Wang, Deng, and Breitfeld. FF Global is the managing member of Pacific, which indirectly controls FF Top, which held over 121 million shares of Company stock as of July 21, 2021, which amounted to approximately 37.4% of the Company. The Proxy Statement further states that FF Global may issue valuable equity interests to members of Company management and Company employees. As employees of Faraday and as members of FF Global's executive committee, Defendants Aydt, Breitfeld, Deng, Jia, and Wang are beholden to one another due to FF Global's ability to award additional compensation to Faraday's management. Defendant Ye, as part of the Company's management, is also beholden to the members of FF Global's executive committee. Thus, Directors Aydt, Breitfeld, and Ye are incapable of independently and

disinterestedly investigating any misconduct committed by one another or by Defendants Deng, Jia, and Wang. Accordingly, demand upon Directors Aydt, Breitfeld, and Ye is excused as being futile.

121. Following the Merger, Defendants Swenson (as Chair), Goh, and S. Vogel (the "Audit Committee Defendants") served as members of the Audit Committee. Pursuant to the Audit Committee Charter and other governance documents, the Audit Committee Defendants are responsible for overseeing, *inter alia*, the quality and integrity of the Faraday's financial statements, Faraday's legal and regulatory compliance, and Faraday's system of internal controls. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and internal controls and failed to ensure compliance with laws and regulations. Additionally, the Audit Committee Defendants' failure to ensure that adequate internal controls were in place resulted in Faraday issuing false and misleading financial statements to investors and failing to timely file a quarterly report with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties and are not disinterested. Accordingly, demand on the Audit Committee Defendants is excused as being futile.

122. Violating the Company's Code of Business Conduct and Ethics (the "Code of Conduct"), the Directors conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, which including breaches of fiduciary duty and violations of the Exchange Act, and the aiding and abetting thereof. Further violating the Code of Conduct, the Directors failed to comply with laws and regulations or ensure the Company's compliance therewith, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and report violations of the Code of Conduct promptly. Thus, the Directors face a substantial likelihood of liability and demand on them is excused as being futile.

Verified Shareholder Derivative Complaint

123.   Faraday has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct. This is true even though the Special Committee has concluded its investigation and detailed its findings. For instance, despite that Defendant Wang was suspended without pay and non-party Jarret Johnson separated from the Company, the Directors have initiated no suit against them to recover for damages to the Company. Thus, any demand upon the Directors is excused as being futile.

124.   The Individual Defendants' conduct was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, such conduct could not have been the product of legitimate business judgment. Accordingly, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As at least a majority of the Directors face a substantial likelihood of liability, the Directors are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the Company's shareholders. Accordingly, demand is excused as being futile.

125.   The acts complained of herein are incapable of ratification because they constitute violations of fiduciary duties owed by Faraday's officers and directors.

126.   The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused Faraday to purchase it for their protection with corporate funds, i.e., monies belonging to Faraday's stockholders. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by Faraday against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of Faraday's officers, there would be no insurance protection. Thus,

the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage—if such an insurance policy exists—will provide a basis for Faraday to effectuate a recovery. Thus, demand on the Directors is excused as being futile.

127.   In the event there is no directors' and officers' liability insurance, then the Directors will not cause Faraday to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Thus, demand is futile in that event, as well.

128.   For all of the reasons set forth above, all nine of the Directors, and, if not all nine of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, demand upon the Board is excused as being futile.

## FIRST CLAIM

### Against the PSAC Defendants for Violations of Section 14(a) of the Exchange Act

129.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

130.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

131.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements

therein not false or misleading." 17 C.F.R. § 240.14a-9.

132.    Under the direction and watch of the PSAC Defendants, the Proxy Statement failed to disclose, *inter alia*: (1) the PSAC Defendants were breaching their fiduciary duties to PSAC by failing to exercise risk oversight functions at PSAC and by causing or permitting PSAC to issue false and misleading statements; (2) the post-Merger Board and Audit Committee would not adequately exercise these functions and would cause or permit the Company to issue false and misleading statements, as discussed *supra* ¶ 73; and (3) Defendant J. Vogel—a member of the PSAC Board who had breached his fiduciary duties—was improperly interested in increasing his compensation and the compensation of his brother S. Vogel by seeking shareholder approval of the 2021 Plan.

133.    The Proxy Statement also failed to disclose that: (1) Legacy FF was not as close to vehicle production as claimed; (2) certain of Legacy FF's assets in China had been frozen by courts; (3) only several hundred of Legacy FF's 14,000 touted reservations were paid reservations, while others were merely unpaid indications of interest; (4) a material number of Legacy FF's reservations for future vehicle deliveries were attributable to a single affiliate that was undisclosed; (5) as a result of the foregoing, the post-Merger Company would be unable to file its quarterly report for the third quarter of 2021; and (6) the Company failed to maintain internal controls. As a result, the Proxy Statement was materially false and misleading.

134.    The PSAC Defendants should have known in the exercise of reasonable care that by misrepresenting or failing to disclose the foregoing material facts, the statements in the Proxy Statement were materially false and misleading. These misrepresentations and omissions were material to Plaintiff in voting on the matters set forth in the Proxy Statement for shareholder determination, including but not limited to, the election of Directors, the 2021 Plan, the NASDAQ Proposal, and amendments to the Company's certificate of incorporation.

135.    As a result of the Proxy Statements false and misleading elements, Company

shareholders elected Defendants Aydt, Breitfeld, Krolicki, J. Vogel, and Ye to the Board, allowing them to continue breaching their fiduciary duties to Faraday or aiding and abetting such breaches, and elected Defendants Goh, Liu, Swenson, and S. Vogel to the Board, who breached their fiduciary duties to the Company following the Merger. As a further result of the Proxy Statements false and misleading elements, shareholders approved, *inter alia*: (1) the Merger; (2) amendments to PSAC's amended and restated certificate of incorporation; (3) the 2021 Plan; and (4) the NASDAQ Proposal.

136.    The Company was damaged as a result of the PSAC Defendants' material misrepresentations and omissions in the Proxy Statement.

137.    Plaintiff, on behalf of Faraday, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties[2]

138.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

139.    Each Individual Defendant owed Faraday the duty to exercise candor, good faith, and loyalty in the management and administration of its business and affairs.

140.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

141.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to Faraday. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect Faraday's rights and interests.

142.    Breaching their fiduciary duties owed to Faraday, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) Operating Faraday was not as close to vehicle production as claimed; (2) certain of

---

[2] Plaintiff specifically excludes Defendant Deng from this claim.

Verified Shareholder Derivative Complaint

Operating Faraday's assets in China had been frozen by courts; (3) only several hundred of Operating Faraday's 14,000 touted reservations were paid reservations, while others were merely unpaid indications of interest; (4) a material number of Operating Faraday's reservations for future vehicle deliveries were attributable to a single affiliate that was undisclosed; (5) as a result of the foregoing, the Company would be unable to file its quarterly report for the third quarter of 2021; and (6) the Company failed to maintain internal controls. As a result of the foregoing, Faraday's public statements were materially false and misleading at all relevant times.

143.   Further breaching their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact. As a result, they are personally liable to the Company for breaching their fiduciary duties.

144.   The PSAC Defendants breached their fiduciary duties by causing the Company to engage in the Overpayment Misconduct.

145.   The PSAC Defendants also breached their fiduciary duties by failing to timely file the Company's quarterly report for the fiscal quarter ended March 31, 2021.

146.   The Board and Defendant McBride also breached their fiduciary duties by failing to timely file the Company's quarterly report for the fiscal period ended September 30, 2021.

147.   The Individual Defendants further breached their fiduciary duties by causing the Company to fail to maintain internal controls.

148.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, yet they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. The Individual Defendants made

such material misrepresentations and omissions knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

149.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that Faraday was engaging in the fraudulent scheme set forth herein, and that the Company's internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused Faraday to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. This misconduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Faraday's securities. The Individual Defendants should have taken appropriate action in good faith to correct the scheme alleged herein and to prevent it from continuing to occur.

150.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

151.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, the Company has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to Faraday.

152.   Plaintiff on behalf of Faraday has no adequate remedy at law.

## THIRD CLAIM
### Against Defendants Breitfeld, Feldman, Glasman, Jia, McBride, and J. Vogel for Contribution Under Section 10(b) and 21D of the Exchange Act

153.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

154.   The Company and Defendants Breitfeld, Feldman, Glasman, McBride, J. Vogel, and Jia are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange

Act, and Rule 10b-5 promulgated thereunder. If and when Faraday is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to the willful and/or reckless violations by Defendant Breitfeld, Feldman, Glasman, Jia, McBride, and J. Vogel of their obligations as officers and/or directors of the Company.

155.   Defendants Breitfeld, Feldman, Glasman, Jia, McBride, and J. Vogel, because of their positions of control and authority as Faraday's officers and/or directors, respectively, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

156.   Accordingly, Defendants Breitfeld, Feldman, Glasman, Jia, McBride, and J. Vogel are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

157.   Thus, Faraday is entitled to receive all appropriate contribution or indemnification from Defendants Breitfeld, Feldman, Glasman, Jia, McBride, and J. Vogel.

**FOURTH CLAIM**
**Against the Legacy FF Defendants for Aiding and Abetting**
**Breach of Fiduciary Duty**

158.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

159.   The Legacy FF Defendants aided and abetted the PSAC Defendants who breached their fiduciary duties to the Company.

160.   The Legacy FF Defendants' misconduct resulted in continuous, connected, and ongoing harm to the Company.

161.   Specifically, the Legacy FF Defendants promoted the Merger by issuing false

and misleading statements concerning Legacy FF's products, operations and business prospects. Moreover, the Legacy FF Defendants controlled and operated Legacy FF, the Company's operational predecessor, and caused Legacy FF to jointly issue press releases and SEC filings which contained materially false and misleading statements promoting the Company's future operations and prospects.

162.   The Legacy FF Defendants are jointly and severally liable to the same extent as the PSAC Defendants are liable for breaches of fiduciary duty as set forth herein or violations of any other laws.

163.   As a direct and proximate result of the Legacy FF Defendants' aiding and abetting of the PSAC Defendants' breaches of duty alleged herein, Faraday has sustained and will continue to sustain substantial damages.

164.   Plaintiff on behalf of Faraday has no adequate remedy at law.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in Faraday's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Faraday, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Faraday;

(c)   Determining and awarding to Faraday the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)   Directing Faraday and the Individual Defendants to take all necessary actions to reform and improve the Company's corporate governance and internal procedures to comply with applicable laws and to protect Faraday and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's

Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

    1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

    2. a provision to permit the Company's shareholders to nominate at least five candidates for election to the Board;

    3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

    (e)    Awarding the Company restitution from Individual Defendants, and each of them;

    (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

    (g)    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: March 21, 2022    Respectfully submitted,

**PORTNOY LAW**

*/s/ Lesley F. Portnoy*
Lesley F. Portnoy, Esq. (304851)
1800 Century Park East, Suite 600
Los Angeles, CA 90067
Tel: (310) 692-8883
Email: lesley@portnoylaw.com

*Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

## <u>VERIFICATION</u>

I, Wangjun Zhou am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of _____, 2022.

3/15/2022

Wangjun Zhou